It is admitted that the bond on which this suit is brought was executed by the defendant to the plaintiffs; and that the plaintiffs have not been paid. But the defendant pleaded that since the execution of the bond a war has existed, in which the plaintiffs were enemies; and that during the war this debt was confiscated and the money paid into the treasury of the State. And the plaintiffs reply that by the treaty which terminated the war, it was stipulated that "creditors on either side should meet with no lawful impediment to the recovery of bona fide debts heretofore contracted."
Debts contracted to an alien are not extinguished by the intervention of a war with his nation. His remedy is suspended while the war lasts, because it would be dangerous to admit him into the country, or (687) to correspond with agents in it; and also because a transfer of treasure from the country to his nation would diminish the ability of the former, and increase that of the latter, to prosecute the war. But with the termination of hostilities, these reasons and the suspension of the remedy case.
As to the confiscation here alleged, it is doubtless true that enemy's debts, so far as consists in barring the creditor and compelling payment from the debtors for the use of the public, can be confiscated; and that on principles of equity, though perhaps not of policy, they may be. For their confiscation, as well as that of property of any kind, may serve as an indemnity for the expenses of war, and as a security against future aggression. That such confiscations have fallen into disuse, has resulted not from the duty which one nation, independent of treaties, owes to another, but from commercial policy, which European nations have found a common, and indeed a strong interest, in supporting. Civil war, which terminates in a severance of empire, does, perhaps, less than any other, justify the confiscation of debts; because of the special relation and confidence subsisting at the time they were contracted, and it may have been owing to this consideration, as well as others, that the American States, in the late Revolution, so generally forbore to confiscate the debts of British subjects. In Virginia they were only sequestered; in South Carolina all debts, to whomsoever due, were excepted from confiscation; as were in Georgia, those of "British merchants and others residing in Great Britain." And in the other states, except this, I do not recollect that British debts were touched. Certain it is, that the recommendation of Congress on the subject of confiscation did not extend to them. North Carolina, however, judging for here self, in a moment of severe pressure, exercised the sovereign power of passing an act of confiscation, which extended, among others, to the debts of the plaintiffs. Providing, however, at the same time, as to all debts which *Page 617 
should be paid into the treasury under that act, that the State would indemnify the debtors should they be obliged to pay again.
Allowing, then, that the debt in question was in fact and of (688) right confiscated, can the plaintiffs recover by the treaty of 1783?
The 4th article of that treaty is in the following words: "It is agreed that creditors on either side shall meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts heretofore contracted."
There is no doubt but the debt in question was a "bona fide" debt, andtheretofore contracted, i.e., prior to the treaty. To bring it within the article, it is also requisite that the debtor and creditor should have been on different sides, with reference to the parties to the treaty, and as the defendant was confessedly a citizen of the United States, it must appear that the plaintiffs were subjects of the King of Great Britain; and it is pretty clear, from the pleadings and the laws of the State, that they were so. It is true that on the 4th of July, 1776, when North Carolina became an independent State, they were inhabitants thereof, though natives of Great Britain; and they might have been claimed and holden as citizens, whatever were their sentiments or inclinations. But the State afterwards, in 1777, liberally gave to them, with others similarly circumstanced, the option of taking an oath of allegiance, or of departing the State under a prohibition to return, with the indulgence of a time to sell their estates, and collect and remove their effects. They chose the latter; and ever after adhered to the King of Great Britain, and must therefore be regarded as on the British side.
It is also pertinent to the inquiry, whether the debt in question be within the before recited article, to notice an objection which has been stated by the defendant's counsel, viz., that at the date of the treaty, what is now sued for as a debt was not a debt, but a nonentity; payment having been made, and a discharge effected, under the act of confiscation; and therefore that the stipulation concerning debts did not reach it.
In the first place, it is not true that in this case there was no debt at the date of the treaty. A debt is created by contract, and exists till the contract is performed. Legislative interference, to exonerate a debtor from the performance of his contract, whether upon or (689) without conditions, or to take from the creditor the protection of law, does not in strictness destroy the debt, though it may, locally, the remedy for it. The debt remains, and in a foreign country payment is frequently enforced.
Secondly, it was manifestly the design of the stipulation that where debts had been theretofore contracted, there should be no bar to their recovery from the operation of laws passed subsequent to the contracts. *Page 618 
And to adopt a narrower construction would be to leave creditors to a harder fate than they have been left to by any modern treaty.
Upon a view, then, of all the circumstances of this case, it must be considered as one within the stipulation that there should be "no lawful impediment to a recovery." And it is not to be doubted that impediments created by the act of confiscation are lawful impediments. They must therefore be disregarded, if the treaty is a rule of decision. Whether it is so or not remains to be considered.
Here it is contended by the defendant's counsel that the confiscation act has not been repealed by the State; that the treaty could not repeal or annul it; and therefore that it remains in force and secures the defendant.
And further, that a repeal of it would not take from him a right vested to stand discharged.
As to the opinion that a treaty does not annual a statute, so far as there is an interference, it is unsound. A statute is a declaration of the public will, and of high authority; but it is controllable by the public will subsequently declared. Hence the maxim, that when two statutes are opposed to each other, the latter abrogates the former. Nor is it material, as to the effect of the public will, what organ it is declared by, provided it be an organ constitutionally authorized to make the declaration. A treaty, when it is in fact made, is, with regard to each nation that is a party to it, a national act, an expression of the national will, as much so as a statute, can be. And it does, therefore, of necessity, annul any prior statute, so far as there is an interference. The supposition that the public can have two wills at the same time, repugnant to (690) each other, one expressed by a statute, and another by a treaty, is absurd.
The treaty now under consideration was made, on the part of the United States, by a Congress composed of deputies from each state, to whom were delegated by the articles of confederation, expressly, "the sole and exclusive right and power of entering into treaties and alliances"; and being ratified and made by them, it became a complete national act, and the act and law of every state.
If, however, a subsequent sanction of this State was at all necessary to make the treaty law here, it has been had and repeated. By a statute passed in 1787, the treaty was declared to be law in this State, and the courts of law and equity were enjoined to govern their decisions accordingly. And in 1789 was adopted here the present Constitution of the United States, which declared that all treaties made, or which should be made under the authority of the United States, should be the supreme law of the land; and that the judges in every state should be bound thereby; anything in the Constitution or laws of any state to the *Page 619 
contrary not withstanding. Surely, then, the treaty is now law in this State, and the confiscation act, so far as the treaty interferes with it, is annulled.
Still it is urged that annulling the confiscation act cannot annul the defendant's right of discharge, acquired while the act was in force.
It is true that the repeal of a law does not make void what has been well done under it. But it is also true, admitting the right here claimed by the defendant to be as substantial as a right of property can be, that he may be deprived of it, if the treaty so requires. It is justifiable and frequent, in the adjustment of national differences, to concede for the safety of the state the rights of individuals. And they are afterwards indemnified or not, according to circumstances. What is most material to be here noted is, that the right or obstacle in question, whatever it may amount to, has been created by law, and not by the creditors. It comes within the description of "lawful impediments"; all of which, in this case, the treaty, as I apprehend, removes. (691)
Let judgment be for the plaintiffs.
Cited: McNair v. Ragland, 16 N.C. 536.